## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD SOUTHERTON, | |
| Plaintiff, | NO. 3:17-CV-00165 |
| v. | (JUDGE CAPUTO) |
| BOROUGH OF HONESDALE, *et al.*, | |
| Defendants. | |

### MEMORANDUM

Presently before me is a Motion for Summary Judgment (Doc. 67) filed by Defendants Borough of Honesdale, Mayor Melody Robinson, and Borough Council members Jeremy Ebert, Michael Augello, Chris Murray, and Michael Dux. Plaintiff Richard Southerton, Honesdale's Chief of Police, alleges that Defendants retaliated against him, in violation of the First Amendment, for his testimony at a grievance arbitration, statements to the press, and filing of this suit.[1] He also alleges he was not paid overtime, in violation of the Fair Labor Standards Act ("FLSA"). For the reasons that follow, although Southerton's First Amendment retaliation claim fails as a matter of law, he has produced sufficient evidence for his Petition Clause and FLSA claims to survive summary judgment. The Motion will therefore be granted in part and denied in part.

### I. Background

On December 9, 2013, the Honesdale Borough Council created a job description for the position of Chief of Police. (Doc. 69 at ¶ 12 (Defendants' Statement of Undisputed Material Facts); Doc. 74 at ¶ 12 (Southerton's Answer to Defendants' Statement)). The job description listed a number of duties for the position, including "acting as chief

---

[1] I refer to Southerton's claim for retaliation for the filing of this suit (Count IV) as a Petition Clause claim, as the parties do, even though it could conceivably proceed on a Free Speech Clause basis. For the reasons stated in Section III.B of this Memorandum, nomenclature is immaterial to whether Count IV survives summary judgment.

administrative officer of the Honesdale Borough Police Department," "staffing all activities of the Department," recommending and administering discipline, "[h]andl[ing] complaints/grievances," and "respond[ing] to requests for information from media." (Doc. 52-3 at 2-4). On May 12, 2014, Southerton was appointed Chief of Police. (Docs. 69 and 74 at ¶ 3).

Southerton argues that three distinct events led Defendants to retaliate against him: his testimony during a subordinate's grievance arbitration, his statements to the press about a policy he disagreed with, and his filing of this suit.

*The Colombo grievance arbitration*. On August 31, 2016, Southerton participated in a grievance arbitration, in his capacity as Chief of Police, concerning the termination of his subordinate, Police Sergeant Keith Colombo. (*Id.* ¶¶ 34, 36). The arbitration was not transcribed, (*id.* ¶ 42), and there are factual disputes as to whether the arbitration was open to the public, whether it occurred during working hours, and whether Southerton testified under oath (*id.* ¶¶ 39, 45), but the arbitrator did issue a written decision (Doc. 70-6). The arbitrator summarized the factual background as follows:

> Sgt. Colombo has been employed by the Boro since September 2010. . . . On December 7, 2015, [Southerton] summoned Sgt. Colombo to his office. He presented him with a four page document he had prepared[, which] contained a number of allegations of official misconduct by Sgt. Colombo. [These allegations included Colombo's (1) failure to promptly respond to a 911 call, (2) unauthorized appearance on behalf of part-time police officers at a Civil Service Commission meeting, and (3) mistreatment of an arrestee in his custody.] Based primarily upon these actions, the Chief suspended Sgt. Colombo for 10 days without pay and placed him on probation for "not less than 12 months." He also revoked "permission to work outside the department." And, he warned, that "[f]ailure to improve in your overall performance, attitude and positive responses to this disciplinary event . . . will result in your demotion and or termination." . . . Sgt. Colombo returned to work on December 24, 2015[, but was sent home upon his arrival. The Borough Council had already voted to terminate his employment on December 22, 2015.]

(Doc. 70-6 at 3-5). The arbitrator concluded a few weeks later that even if Southerton's written charges and testimony at the arbitration were true, the Borough Council

did not have "just cause" to discharge Colombo, as required by Article XXX of the collective bargaining agreement between the Borough and the police union. (*Id.* at 6-8). The Council "had no right to discipline [Colombo] a second time for the same offenses" Southerton disciplined him for, so the arbitrator ordered Colombo's reinstatement. (*Id.* at 8).

Following the grievance arbitration, Defendants refused Southerton access to police department personnel files, refused to address his concerns regarding officer scheduling, requested that he resign, and stripped Southerton of his scheduling and disciplinary responsibilities, effectively demoting him to a mere police officer. (Doc. 52 at ¶¶ 26-33; Doc. 74-9 at 23-34). Mayor Robinson even assigned scheduling responsibility Southerton's subordinates, telling Southerton to direct any questions or concerns to either his subordinates or the mayor herself. (Doc. 74-7). Councilman Jennings testified at his deposition that he believed Defendants' actions—specifically, revoking Southerton's scheduling, disciplinary, and personnel file maintenance authority—were taken in retaliation for Southerton's testimony at the Colombo arbitration. (Doc. 74-10 at 4). Southerton agrees; in his own words, "I think they retaliated against me because of my testimony. . . . I told them [Colombo] did this, he did that. I don't think they wanted that to get out. I think they wanted to bring Colombo back and that's the best I can explain it." (Docs. 69 and 74 at ¶ 50).

*The River Reporter article.* On November 16, 2016, *The River Reporter* published an articled titled "Honesdale mayor steps up." (*Id.* ¶ 54). Southerton "was interviewed for and quoted in" the article, and "was on duty" and speaking "in his capacity as Chief of Police" when being interviewed. (*Id.* ¶¶ 55-57).

The article discusses, among other things, a "Memorandum of Understanding (MOU) pursuant to the Safe Schools Act" between local schools and law enforcement agencies. (Doc. 70-9 at 2). The MOU stated "that the law enforcement agencies named [including the Honesdale Borough Police Department] will respond to requests from assistance" from local public schools. (*Id.*). According to the article, Mayor Robinson noted at a November 14, 2016 Council meeting that Southerton objected to signing the MOU. (*Id.*). Southerton

explained to the reporter by phone on November 15 that he refused to sign over "concern[s] about the school's discretion in referring incidents to the borough police." (*Id.*). Southerton was quoted as saying: "My department has been accused of failing to handle appropriately incidents of which it was not even aware[.] . . . How can we respond to something we don't even know about?" (*Id.*). From Southerton's perspective, his "refusal to sign the MOU [wa]s a form of passive protest" that did not prevent the police from assisting local schools, or prevent the Mayor herself from signing the MOU on the police department's behalf. (*Id.*).

Retaliation ensued, according to Southerton, in the form of the Council entertaining a complaint filed against him on December 14, 2016 by his subordinate, Police Lieutenant Robert Langman. (Doc. 52 at ¶¶ 35, 37). Langman's complaint accused Southerton of wrongdoing, and specifically mentioned Southerton's testimony at Colombo's grievance arbitration. (*Id.*). The Council considered Langman's complaint despite the fact that Langman failed to follow department procedure. (*Id.* ¶ 37). Nor did Southerton receive a requested public hearing regarding the complaint. (Doc. 74-9 at 176:18-25). Ultimately, however, the Council "decided not to go forward with any charges," (*id.* at 178:15-17), and Borough Solicitor Rich Henry informed Southerton "that all the complaints were unfounded," (*id.* at 181:4-5). No discipline against Southerton followed. (*Id.* at 177:8-10). And nothing else happened "[e]xcept for Keith Colombo carrying on with everybody saying that [it's] not over because the borough council has never come back and voted on whether it's unfounded or not, and he continually . . . brings that up at the . . . police department." (*Id.* at 181:13-20).

*Filing suit.* Finally, on January 30, 2017, Southerton filed the instant suit. (Doc. 52 at ¶ 50; Doc. 1). The original complaint contained the same allegations that have already been discussed: that Defendants retaliated against Southerton for testifying at Colombo's grievance arbitration and speaking to the press about his refusal to sign the MOU. (*See* Doc. 1). After filing suit, Southerton alleges that he suffered retaliation in the form of "wage, hours and benefits issues" with Defendants, who "have deliberately not provided [Southerton] with pay and benefits as a result of filing this lawsuit" even though "every other

police officer has had his pay corrected." (Doc. 52 at ¶¶ 54, 55). Southerton testified at his deposition that Borough Secretary Judy Poltanis even told him that "they're not going to do anything [with respect to these issues] because of the federal lawsuit." (Doc. 74-9 at 184:9-10).

Southerton also claims that from "late 2013 through 2017, [he] worked over 40 hours in a work week" but the Borough "failed to pay him time and a half" as required by the FLSA and the collective bargaining agreement in place between the Borough and the police union. (Doc. 52 at ¶¶ 45-46).

After a few amendments to his complaint, Southerton has settled on four claims: First Amendment retaliation (Count I); Negligent training, i.e., *Monell* liability for Count I (Count II); failure to pay overtime in violation of the FLSA (Count III); and retaliation in violation of the Petition Clause of the First Amendment (Count IV). (*See* Doc. 52). Defendants filed the instant Motion for Summary Judgment (Doc. 67) on July 17, 2018. Defendants challenge Southerton's First Amendment retaliation and Petition Clause claims largely on the grounds that Southerton engaged in employee speech, not citizen speech, and that his speech and lawsuit are not matters of public concern. The *Monell* claim must also fail, Defendants say, because there is no underlying constitutional violation. Additionally, they take issue with Southerton's prayer for punitive damages for his constitutional claims. As for Southerton's FLSA claim, Defendants argue that Southerton is an exempt administrative employee, and thus the FLSA's overtime provisions do not apply.

The Motion has been fully briefed and is ripe for review.

## II. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A court may grant a motion for summary judgment if, after it considers all probative materials of record, with inferences drawn in favor of the non-moving party, the court is satisfied that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d

210, 218 (3d Cir. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986)); *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000)). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law. A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter . . . ." *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 587, 581 (3d Cir. 2009) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden to identify "specific portions of the record that establish the absence of a genuine issue of material fact." *Santini*, 795 F.3d at 416 (citing *Celotex*, 477 U.S. at 323). If this burden is satisfied by the movant, the burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The non-movant's burden is not satisfied by "simply show[ing] that there is some metaphysical doubt as to the material facts." *Chavarriaga*, 806 F.3d at 218.

### III. Discussion

**A.     Counts I and II—First Amendment Retaliation and *Monell* liability**

Southerton argues that his testimony at Colombo's grievance arbitration and his statements to *The River Reporter* merit First Amendment protection. (Doc. 73 at 9-20). Defendants instead contend that on both occasions, Southerton was speaking as an employee, not as a citizen, and that his speech did not touch on matters of public concern, thus taking Southerton's speech out of the First Amendment's grasp. (Doc. 68 at 15-35). And if Southerton's speech was not protected, Defendants continue, there can be no *Monell* claim any of the defendants. (*Id.* at 30).

First Amendment retaliation claims are evaluated under a three-step process. *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997). "First, [the] plaintiff must establish

the activity in question was protected." *Baldassare v. State of N.J.*, 250 F.3d 188, 194 (3d Cir. 2001). A public employee's speech is protected if it is made as a citizen (and not as an employee) and involves a matter of public concern. *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 987 (3d Cir. 2014). If that threshold is met, the "plaintiff must demonstrate his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees." *Baldassare*, 250 F.3d at 195 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Finally, "[i]f these criteria are established, [the] plaintiff must then show the protected activity was a substantial or motivating factor in the alleged retaliatory action." *Id.*

As for the first prong, "[i]n order to qualify for First Amendment protection, a public employee must be speaking in his capacity as a citizen, and not as a government employee." *McAndrew v. Bucks Cty. Bd. of Comm'rs*, 183 F. Supp. 3d 713, 732 (E.D. Pa. 2016) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). "[T]he 'controlling factor' is whether the statements were 'made pursuant to the speaking employee's duties,' that is, whether such utterances were among the things that the employee 'was employed to do.'" *Flora v. Cty. of Luzerne*, 776 F.3d 169, 176-77 (3d Cir. 2015) (brackets omitted) (quoting *Garcetti*, 547 U.S. at 421); *see Lane v. Franks*, 573 U.S. 228, 134 S. Ct. 2369, 2379 (2014). Accordingly, a public employee's speech may still be protected by the First Amendment even if it "concerns information acquired by virtue of his public employment." *Lane*, 134 S. Ct. at 2379; *see Dougherty v. Sch. Dist. Of Phila.*, 772 F.3d 979, 988-89 (3d Cir. 2014) (the fact that an employee's speech "owes its existence to" his employment or "concern[s] the subject matter of [his] employment" is "nondispositive"). The key inquiry is whether the speech at issue was "outside the scope of [the employee's] ordinary job responsibilities." *Lane*, 134 S. Ct. at 2378. That inquiry is a "practical one," *Garcetti*, 547 U.S. at 424, and whether speech falls within the scope of one's ordinary job duties is a mixed question of law and fact. *Dougherty*, 772 F.3d at 988.

    1.    <u>The Colombo grievance arbitration</u>

I address Southerton's testimony at Colombo's grievance arbitration first. Under

*Lane*, the threshold question is whether Southerton's arbitration testimony "[wa]s itself ordinarily within the scope of [his] duties." 134 S. Ct. at 2378.

But Southerton argues his testimony is deemed citizen speech, regardless of his duties, by *Reilly v. City of Atl. City*, 532 F.3d 216 (3d Cir. 2008). (Doc. 73 at 10-12). Under *Reilly*, "courtroom testimony is categorically 'citizen speech' as contemplated by the First Amendment." *Carlson v. Beemer*, 225 F. Supp. 3d 297, 305 (M.D. Pa. 2016). Testifying in an arbitration, Southerton contends, is sufficiently like testifying in court to merit First Amendment protection. Indeed, the Supreme Court's holding in *Lane v. Franks* that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen" is not limited, by its language, to the courtroom. 134 S. Ct. 2369, 2378 (2014). *Lane* makes clear, however, that *Garcetti* still applies—testimony is only citizen speech if it is given "outside the scope of [one's] ordinary job duties." *Id.* That may be why *Lane* interprets *Reilly* to speak "to whether public employees may be fired . . . for providing truthful subpoenaed testimony *outside* the course of their ordinary job responsibilities." *Id.* at 2377 (emphasis added) (citing *Reilly*, 532 F.3d at 231). But as the court in *Carlson* pointed out, *Reilly* takes a categorical approach. 225 F. Supp. 3d at 305; *see Reilly*, 532 F.3d at 228, 231 (the "fact of Reilly's sworn testimony" itself was sufficient for the court to conclude that "[w]hen a government employee testifies truthfully [in court,] . . . the employee is acting as a citizen"). *Reilly* thus ventures beyond *Lane* with respect to courtroom testimony, always deeming it speech outside the scope of a public employee's ordinary job duties. *See Lane v. Franks*, 134 S. Ct. 2369, 2378 n.4 (2014) (noting it was undisputed that testifying in court was outside Lane's ordinary job duties and thus declining to decide "whether truthful sworn testimony would constitute citizen speech under *Garcetti* when given as part of a public employee's ordinary job duties"); *id.* at 2384 (Thomas, J., concurring).

Given these precedents, if a public employee testifies in *court*, he speaks as a citizen because under *Reilly* he has an "independent obligation as a citizen to testify truthfully," which categorically satisfies *Garcetti*'s duty inquiry, 532 F.3d at 231; but if a public employee

testifies *elsewhere*, such as in a grievance arbitration, *Lane* applies and I must independently consider if that testimony falls within the employee's ordinary job duties. The reason for drawing the line at the courthouse door is *Reilly*'s emphasis on the protection of "the integrity of the *judicial* process," the societal truth-seeking function of courtroom proceedings like grand jury investigations and criminal trials, and the fact that courtroom testimony "is bound by the dictates of the court and the rules of evidence." 532 F.3d at 228-29, 231 (emphasis added). Labor arbitrations conducted under American Arbitration Association rules ("AAA rules," which Southerton says applied (Doc. 73 at 11)), though, are not bound by rules of evidence. *See* AAA Rule 27 (available at https://www.adr.org/sites/default/files/Labor_Arbitration_Rules_0.pdf). Arbitrators "may require witnesses to testify under oath," but are not obligated to do so. *Id.* Rule 23. They "shall maintain the privacy of the hearing" and have the discretion "to determine the propriety of the attendance of any other person other than a party and its representatives." *Id.* Rule 21. Labor arbitrations are thus hardly "quasi-judicial proceeding[s]" but rather "informal[] and flexib[le]" contractual dispute resolution mechanisms, the specifics of which are "best left to negotiation" between employers and employees. *Virgin Islands Nursing Assoc.'s Bargaining Unit v. Schneider*, 668 F.2d 221, 224 (3d Cir. 1981). Arbitrating parties define justice contractually, whereas grand juries and criminal trials (and even civil trials), on the other hand, implicate a broader public interest, *see, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 736-37 (1972) (Stewart, J., dissenting) (society has an "interest in the use of the grand jury to administer justice fairly and effectively").

*Reilly*'s categorical approach is therefore rightly limited to the courtroom context, even if in this case the arbitrator opened up the hearing to the public and required Southerton to testify under oath. *See McAndrew v. Bucks Cty. Bd. of Comm'rs*, 183 F. Supp. 3d 713, 733-34 (E.D. Pa. 2016) (applying *Garcetti* and *Lane*, rather than *Reilly*, to an officer's claim that he was retaliated against for testifying at a disciplinary hearing, without analyzing the character of the hearing). The particular rules under which arbitrating parties agree to process their dispute is ultimately immaterial; for instance, under *Reilly*, the First

Amendment protects public employees' grand jury testimony even though grand jury investigations are not public and the rules of evidence do not apply. *See, e.g.*, Fed. R. Crim. P. 6; Fed. R. Evid. 1101(d)(2). But judicial proceedings, unlike grievance arbitrations, involve public rather than private interests. The purpose of the forum is what *Reilly* drives at, not its particular characteristics (although the fact that parties define the characteristics of an arbitral forum sheds light on its purpose). The question, then, is not whether Colombo's grievance arbitration looked enough like a trial to trigger *Reilly*, but whether Southerton's testimony at the grievance arbitration—taking into consideration Southerton's speech, his job duties, and the purpose of the arbitration—was offered as an employee or a citizen.

With regard to this question, the material facts are not in dispute. Southerton testified at Colombo's grievance arbitration about his disciplining Colombo for malfeasance. The purpose of the arbitration, as Southerton understood it, was that "Sergeant Colombo was grieving his termination from the borough[;]" Colombo "was trying to get his job back." (Doc. 74-9 at 38:8-15). Southerton testified in his capacity as Chief of Police. (Docs. 69 and 74 at ¶¶ 34, 36). And at the time in question, it was within Southerton's job duties to discipline subordinates. (*See* Doc. 52-3 at 3; Doc. 52 ¶ 33 (alleging that Southerton was stripped of his disciplinary duties in retaliation for his arbitration testimony)).

Given these facts, Southerton testified at Colombo's arbitration not as a citizen, but in his capacity as an employee: he understood that the arbitration's purpose was to address Colombo's employment with the Borough, and testified in his capacity as a Borough employee. Most critically, testifying at a grievance arbitration undoubtedly fell within the scope of Southerton's ordinary disciplinary duties. His ability to effectively discipline subordinates depended on testifying because an arbitrator could have invalidated discipline on the basis of the collective bargaining agreement—tellingly, the Borough's formal job description (which is by no means controlling) includes the handling of grievances among the Chief of Police's duties. (Doc. 52-3 at 3; *see* Doc. 74-9 at 74:1-4 (Southerton believed the grievance arbitration was "winnable")). Thus, this case is akin to *McAndrew v. Bucks*

*County Board of Commissioners*, where the court held that a police officer who believed he was testifying as an employee at his supervisor's disciplinary hearing spoke as an employee, not as a citizen. 183 F. Supp. 3d 713, 733-34 (E.D. Pa. 2016). Like in *McAndrew*, Southerton admits that he testified in his capacity as an employee in discharge of an ordinary job duty. *Cf. Gorum v. Sessoms*, 561 F.3d 179, 185-86 (3d Cir. 2009) (a professor who advised a student at a disciplinary hearing spoke as an employee because, among other reasons, "[i]t was through his position . . . that [he] was able to aid [the student]" with his "special knowledge of, and experience with, the . . . disciplinary code"). Under *Garcetti* and *Lane*, that means he spoke as a employee and the First Amendment did not protect his speech.

Because I conclude that Southerton spoke as a employee at Colombo's arbitration, I need not address Defendants' punitive damages or qualified immunity arguments. However, I note in passing that "[n]o circuit has adopted the rule that sworn testimony in a private arbitration is on a matter of public concern, regardless of content[,]" *Rorrer v. City of Stow*, 743 F.3d 1025, 1048 (6th Cir. 2014), and *Lane v. Franks* did not answer the question of "whether a public employee speaks 'as a citizen' when he testifies in the course of his ordinary job responsibilities," 134 S. Ct. 2369, 2384 (Thomas, J., concurring) (also noting that police officers testify as "a routine and critical part of their employment duties").

2. *The River Reporter* article

Southerton's statements to *The River Reporter* present an issue more easily resolved. The same three-step framework for evaluating First Amendment retaliation claims applies. Relevant here, as before, is the first step: Southerton was protected from retaliation only if he spoke as a citizen on a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

The fatal flaw to Southerton's claim: Southerton was under the impression that he was speaking as an employee when he spoke with *The River Reporter*. He admits that he spoke in his capacity as Chief of Police, while on duty; in his words: "according to my job description, I'm allowed to talk to the press, and I'm correcting what I think is a

misstatement, several misstatements." (Doc. 74-9 at 229:10-15). When asked at his deposition if he ever spoke to the press "as a citizen," Southerton responded: "No, I think I've talked to them—well, if I've talked to them, I'm talking to them as chief." (*Id.* at 229:16-21). Southerton was thus not publicly advancing a point of view as a citizen but rather speaking to the press pursuant to his official duties as Chief of Police. That means his speech was unprotected as a matter of law. *See McAndrew v. Bucks Cty. Bd. of Comm'rs*, 183 F. Supp. 3d 713, 733-34 (E.D. Pa. 2016) (officer who believed he was testifying on the clock as an employee spoke as an employee).

To save his First Amendment retaliation claim, Southerton raises (for the first time) what he says was another instance of protected speech: "he vocalized problems with officers' scheduling, thereby raising safety concerns to [the] Borough Council." (Doc. 73 at 9 n.1 (citing Southerton's deposition testimony)). The Council's refusal to act on Southerton's concerns, however, is alleged to be *retaliation* for his arbitration testimony. (Doc. 52 at ¶¶ 21-27). This is therefore a new claim, and it may not be raised for the first time in a brief in opposition to summary judgment. *Anderson v. DSM N.V.*, 589 F. Supp. 2d 528, 534 n.5 (D.N.J. 2008). Even if I were to consider it, however, Southerton's reporting of scheduling concerns would on this record constitute unprotected employee speech. (Doc. 52-3 at 2-3 (Chief of Police has duty to make recommendations to the Council)); *Killion v. Coffey*, 696 F. App'x 76, 78-79 (3d Cir. 2017) (speech that "embodies 'special knowledge' acquired through the job" may be unprotected); *Foraker v. Chaffinich*, 501 F.3d 231, 241-43 (3d Cir. 2007) (officers required to report safety concerns up the chain of command spoke as unprotected employees), *abrogated on other grounds by Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011).

Because neither Southerton's testimony at the Colombo arbitration, his statements to *The River Reporter*, nor his reporting safety concerns to the Borough Council was protected, Southerton's First Amendment retaliation claim thus fails as a matter of law. Count I of the Third Amended Complaint will be dismissed.

3.   *Monell* liability

Because Southerton's First Amendment retaliation claim fails as a matter of law, Defendants cannot be liable under *Monell*. *Mills v. City of Harrisburg*, 350 F. App'x 770, 773 n.2 (3d Cir. 2009) ("Absent an underlying constitutional violation by an agent of the municipality, . . . the municipality itself may not be held liable under § 1983); (*see* Doc. 52 at ¶ 40 (Southerton's *Monell* claim is based entirely on the First Amendment retaliation alleged in Count I)).

Count II of the Third Amended Complaint will therefore be dismissed.

**B.   Count IV—Petition Clause**

Defendants next challenge Southerton's Petition Clause claim. Southerton claims that Defendants retaliated against him for filing this lawsuit by failing to pay him, provide benefits, or correct his pay, even though every other officer had his pay corrected. (Doc. 52 at ¶¶ 54, 55). Defendants argue that Southerton's suit is not protected under the Petition Clause because it does not constitute speech on a matter of public concern. (Doc. 68 at 32-35). Southerton, for his part, argues that this lawsuit is in fact a matter of public concern. (Doc. 73 at 22-24).

A public employee's lawsuit can be protected under the First Amendment's Petition Clause in addition to the Free Speech Clause. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). Under either Clause, for the suit to be protected, it must involve a matter of public concern. *Id.* at 398. "[W]hether an employee's petition relates to a matter of public concern will depend on 'the content, form, and context of [the petition], as revealed by the whole record.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 & n.7 (1983)). "The forum in which a petition is lodged [is also] relevant to the determination of whether the petition relates to a matter of public concern." *Id.* It is clear that merely including a First Amendment retaliation claim in a lawsuit does automatically render it a matter of public concern. *Morgan v. Covington Twp.*, 563 F. App'x 896, 901 (3d Cir. 2014). While "[a] complaint arising out of public employment need not include indications that there is a systemic problem interfering with the public agency's performance of its governmental functions[,]" to address a matter of public concern a plaintiff must "do more than allege

retaliation arising out of the unusual circumstances of his individual employment dispute." *Id.* (quotation and internal quotation marks omitted). "Whether a petition raises an issue of public concern is a question of law for the court." *Id.* at 903 (citing *Baldassare v. State of N.J.*, 250 F.3d 188, 195 (3d Cir. 2001)).

This suit involves a matter of public concern. First, this is not a "petition filed with an employer using an internal grievance procedure," *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011), but rather a suit filed in federal court. That weighs in favor of a finding of public concern. *Sharif v. Manning*, No. 1:13-CV-96, 2013 WL 3754818, at *12 (M.D. Pa. July 11, 2013) ("A court filing is a public communication."). Second, and most important, the allegations in the original complaint (which are what Defendants are alleged to have retaliated against Southerton for) do provide "indications that there is a systemic problem interfering with [a] public agency's performance of its governmental functions." *Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 980 (3d Cir. 1997) (en banc). Southerton alleges that Defendants refused him access to his department files, refused to address his concerns for the safety of the department, and ultimately requested that he resign in violation of state law. (Doc. 1 at ¶¶ 26, 27, 29). These allegations go beyond "merely personal grievances," *Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 829 (3d Cir. 1994), even if the relief Southerton seeks is primarily personal in nature. The public would surely take interest in allegations of misconduct by elected officials and a breakdown of a police department's functioning. *Watters v. City of Phila.*, 55 F.3d 886, 895 (3d Cir. 1995) ("We conclude that the public had a significant interest in learning about problems which . . . could have affected the delivery of police services."); *cf. Sharif*, 2013 WL 3754818 at *12 (denying motion to dismiss as the court could "reasonably infer that Plaintiff has some interest not only in winning his lawsuit and gaining whatever rewards may follow, but also in placing . . . alleged misconduct . . . in the public sphere for outside scrutiny").

Accordingly, Defendants' Motion will be denied as to Count IV of the Third Amended Complaint.

**C.     Count III—FLSA**

Finally, Defendants solely challenge Southerton's FLSA claim on the ground that he is an administrative employee—meaning the FLSA's overtime provisions do not apply to him. (Doc. 68 at 35-39). Southerton counters that this Court already held that the facts as alleged in the Second Amended Complaint created an issue of fact as to whether the administrative employee exemption applies, and that in any event the exemption does not apply (Doc. 74 at 29-34).

The FLSA requires employers to pay overtime wages to all covered employees who work in excess of forty hours in a given work week. *See* 29 U.S.C. § 207(a)(1). The FLSA, however, contains certain exemptions to the overtime pay requirement, including an exemption for employees working in a "bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). Under regulations promulgated by the Department of Labor, an "employee employed in a bona fide administrative capacity" is an employee: (1) Who is paid a salary "of not less than $455 per week;" (2) "Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer . . . ;" *and* (3) "Whose primary duty include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). "FLSA exemptions should be construed narrowly, that is, against the employer." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). The employer has the burden of proving an exemption applies. *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991). The applicability of an exemption is a mixed question of law and fact: how an employee spends his working time is a question of fact, and whether an exemption applies is a question of law. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 691 (3d Cir. 1994).

The material facts regarding Southerton's job duties are in dispute,[2] so summary

---

[2] I note in passing my earlier conclusions as to Southerton's undisputed official job duties for First Amendment retaliation purposes may have some impact here. It is unclear, though, from the briefing whether the parties contest the applicability of the administrative exemption as to the entirety of the period

15

judgment is inappropriate on his FLSA claim. The formal job description created by the Borough Council gives the impression that Southerton was indeed an exempt administrative employee. (*See* Doc. 74-6 at 2-4). But Southerton denies, for instance, that he is the "administrator" of the Honesdale Borough Police Department. (Docs. 69 and 74 at ¶ 8). He casts himself instead as a "working Police Chief," (Doc. 74 at ¶ 8), and that description is supported by evidence in the record. (*See, e.g.*, Doc. 70-9 ("[Mayor Robinson] said that, when she offered to assume scheduling duty for the chief, Southerton agreed, happy to spend more shifts as one of only three full-time working officers."). Southerton also denies that he has actual supervisory duties (Docs. 69 and 74 at ¶ 10), has responsibility for preparing a budget (*id.* ¶ 11), handles scheduling (*id.* ¶ 13), handles hiring (*id.* ¶ 15), and handles discipline (*id.* ¶¶ 16-17). These facts are material to the question of Southerton's true job duties—they bear on whether Southerton "primary" responsibilities were managerial or involved the "exercise of discretion and independent judgment" on significant matters. 29 C.F.R. § 541.200(a). So I cannot come to any legal conclusions just yet, given that these facts are genuinely in dispute. *See Reich v. Gateway Press, Inc.*, 13 F.3d 685, 691 (3d Cir. 1994).

Defendants' Motion will therefore be denied as to Count III.

### IV. Conclusion

For the reasons stated above, Southerton's First Amendment retaliation claim fails as a matter of law, but his Petition Clause and FLSA claims survive. Defendants' Motion for Summary Judgment will be granted in part and denied in part. An appropriate order follows.

November 6, 2018  /s/ A. Richard Caputo
Date  A. Richard Caputo
  United States District Judge

---

Southerton alleges he was denied overtime pay (2013 through 2017) or just for the portion preceding Defendants' alleged retaliation (2013 through late 2016). Because the parties do not raise this issue, I will not address it further.